**AL HAMILTON CONTRACTING
COMPANY, Petitioner,**

v.

**DEPARTMENT OF ENVIRONMENTAL
RESOURCES, Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 6, 1995.
Decided May 11, 1995.

William C. Kriner, for petitioner.

Dennis A. Whitaker, for respondent.

Before PELLEGRINI and NEWMAN, JJ., and KELTON, Senior Judge.

PELLEGRINI, Judge.

Al Hamilton Contracting Company (Hamilton) petitions for review of an order of the Environmental Hearing Board (EHB) up-

holding a Department of Environmental Resources (DER) order requiring Hamilton to conduct a groundwater study at its Little Beth Mine Site located in Bradford Township, Clearfield County.

Evelyn Cowder owns a property and residence on Shilo Road in Bradford Township. Hamilton was the permittee and operator of a bituminous surface mine at Little Beth since at least 1980. The mine site has Township Road 605 as its northern boundary and Cowder's property is approximately 700 feet north of the boundary. From 1960, when Cowder moved into her residence, she obtained her drinking water from a well on the property and used water from a spring in her basement to cool food. The water from the spring ran through a trough and out a drain in the basement. Beginning in the 1980's, the well water on Cowder's property became hard and then became unsuitable for drinking. In 1988, she was able to connect to the public water line.

Around 1985 or 1986, the water from Cowder's spring began flowing at a faster rate. Because of the faster flow rate, the drain could not keep up with the flow from the spring and would become clogged with "red muck". Three sump pumps were ruined in an effort to continuously pump the water out of a basement window. At times, the water rose to a level of four feet, ruining Cowder's furnace and hot water tank. The acidity of the water caused her grass to die and her pond to be covered with red muck. Cowder filed a complaint with DER in August of 1991 alleging her water problems were caused by mine drainage.

DER assigned Scott Barnes, a hydrogeologist, to investigate Cowder's complaint. Barnes found that Cowder's basement contained two to three feet of foul-smelling water with a thick red scum on the top which was hard in places. Barnes took samples of the water in Cowder's basement and these samples were analyzed revealing a pH of 3, high acidity, high metal concentration, especially iron, and high sulfate concentration. Barnes tested water from springs and seeps in the area and studied geological surveys, government topographic maps, aerial photographs, and data in the surface mining permit applications for Little Beth and other nearby mines. Barnes also explored the surrounding area including Little Beth Mine Site and other old strip mining sites.

Barnes concluded that the water samples were typical of acid mine drainage, relying particularly on the high sulfate and iron levels. Based on its investigation, DER determined Cowder's water was degraded by acid mine drainage and in September of 1992, issued an order stating that it believed that Hamilton's Little Beth Mine Site was the "most likely source" of the acid mine water contaminating Cowder's property. The order directed Hamilton to submit a Groundwater Monitoring Study to define the hydrogeology of the Little Beth operation relative to the groundwater at Cowder's property. Hamilton appealed the order to the EHB.

Before the EHB, DER called Barnes to testify, qualifying him as an expert witness. He testified as to the results of the water analysis and the other facts he relied on in his investigation. Barnes testified that the regional geological structures dip or slope down to the northwest, towards the Cowder property. (Reproduced Record 158a). Barnes testified that by 1980 Hamilton had a mine cut in the northwestern corner of the site on the lower Kittanning coal seam, which is beneath the elevation of Township Road 605. (R.R. 178–79a). Such a cut creates a wall of coal and from that point Hamilton mined from west to east, parallel to the road. Barnes also determined that the lower Kittanning coal seam crops to the north of Township Route 605. (R.R. 178a). Because the mining did not extend to the coal seam crop to the north of the road, by necessity, Barnes concluded, a low wall or high wall existed at the northern edge of the mine site as well. Because of these geological features and the location of mining, a boxcut was formed in the northwestern corner of the Little Beth Mine Site, that is, the walls met creating a corner of unmined strata. (R.R. 179a).

Barnes testified that the Brookhart and Tyo Engineering Subsurface Investigation Profile and Report (Brookhart report) provided by Hamilton to DER in September of 1992 confirmed his conclusion that the lower

Kittanning coal seam crops north of Township Route 605 and north of the edge of Hamilton's mining. Also, based on the Hess and Fisher Hydrologic Conditions Report (Hess and Fisher report) provided by Hamilton to DER in October of 1992, Barnes determined that a buried high wall existed in the northern corner of the Little Beth Mine Site, instead of a low wall, and determined its location and size. Regardless of whether a high wall or low wall existed, Barnes went on to testify that the formation of the boxcut was the most likely source of the groundwater drainage onto Cowder's property.

Barnes based his conclusion on his determination that the Cowder property is topographically and hydrogeologically downgradient from the Little Beth Mine Site (R.R. 202–203a). Groundwater from the mine accumulates in the area of the boxcut, which acts as a dam, and then flows from this area after it accumulates to the top of the walls toward the Cowder tributary hollow, which is a pre-existing stream channel, running next to the Cowder house and into Valley Fork Run. (R.R. 183a, 186a) Barnes stated that groundwater from the mine site would also leak into the old strip mines, which were mined in the 1950's, located east of the Cowder property. (R.R. 187a).[1]

Barnes also testified as to the water analysis in the Cowder tributary, a more eastern tributary, and a ditch dug on the east side of Cowder's property. He described a study of the ditch whereby he determined that groundwater was seeping into the ditch. Based on all of these factors, Barnes opined that the Cowder water had been degraded by acid mine drainage and that the Little Beth Mine Site is the probable cause of the pollution problem on the Cowder property. (R.R. 262a). He stated that the old mines to the east are not the cause of the pollution problem on Cowder's property because the problem developed at a time when discharges from those mines should have been stable or decreasing and because the Cowder property has a higher acidity than the water in the eastern tributary. (R.R. 248a, 224a). While the Little Beth Mine Site was the most likely source of the pollution, Barnes admitted that to determine conclusively whether Little Beth Mine Site was the cause of the Cowder acid mine drainage would require piezometer data or subsurface data of groundwater flow direction and groundwater quality between the mine and Cowder's property. (R.R. 269a).

After presenting the expert testimony of Michael Smith, Barnes' supervisor on the investigation who agreed with Barnes' conclusions, DER rested its case. Hamilton moved to have its appeal sustained arguing that DER had not met its burden because the expert's testimony was not sufficiently certain and because the expert relied on one of Hamilton's exhibits, the Brookhart report, that was not admitted into evidence. DER then requested to reopen their case to introduce additional evidence and in the alternative argued that the expert can rely on materials outside the record upon which an expert would normally rely. Hamilton objected to DER's request to reopen its case. Presiding Board Member Ehmann permitted the reopening. After admitting the Brookhart Report, DER rested and Hamilton presented only additional exhibits in its defense.

■ The EHB held that DER had met its burden to establish by a preponderance of the evidence that ordering Hamilton to do a groundwater study was not contrary to law or an abuse of discretion. It held that DER established a prima facie showing of a causal connection between the Cowder pollution and the Little Beth Mine Site. In response to Hamilton's Motion to Sustain its appeal, the EHB held that the presiding board member did not abuse his discretion in allowing DER to reopen its case.[2] Hamilton then filed this

1. Barnes also described leakage of groundwater from the northwestern part of the mine site into a culvert on Township Route 605, which was the subject of another order by DER and is currently the subject of another appeal before this court, *Al Hamilton v. Department of Environmental Resources,* No. 2308 C.D.1994.

2. Two of the four board members concurred on this issue stating that they were deferring to the presiding board member's determination that the omission of evidence was inadvertent.

petition for review.[3]

Hamilton contends the EHB erred in allowing DER to reopen its case because DER did not follow the proper administrative procedures and in admitting the expert testimony of Barnes which it argues is not based on facts in evidence nor was it sufficiently certain. Hamilton also contends that DER has no authority to order groundwater monitoring under the statute and the case law and that the EHB applied an inappropriate standard of proof.

## I.

■ The first issue before us is whether the EHB erred in allowing DER to reopen its case to admit exhibits relied on by its expert witness. A decision whether to reopen the record in an administrative proceeding is within the discretion of the presiding officer and on review an exercise of that discretion will not be reversed unless a clear abuse is shown. *Metro Transportation Company v. Pennsylvania Public Utility Commission*, 128 Pa.Commonwealth Ct. 223, 563 A.2d 228 (1989).

■ Hamilton first argues that 1 Pa.Code § 35.231, titled "Reopening on application of party" applies to this case and therefore DER should have filed a petition setting forth sufficient grounds for reopening. 1 Pa.Code § 35.231(a) provides:

After the conclusion of a hearing in a proceeding or adjournment thereof sine die, a participant in the proceeding may file with the presiding officer, if before issuance by the presiding officer of a proposed report, otherwise with the agency

head, a petition to reopen the proceeding for the purpose of taking additional evidence. The petition shall set forth clearly the facts claimed to constitute ground requiring reopening of the proceeding, including material changes of fact or of law alleged to have occurred since the conclusion of the hearing.[4]

As determined by the EHB, the provisions of 1 Pa.Code § 35.231 do not apply to this case because they expressly apply only after the conclusion of the hearings or an adjournment without further hearing dates set. In this case, the request for reopening of the record came prior to the conclusion of the hearing and prior to Hamilton's presentation of evidence. Accordingly, the written petition set forth in 1 Pa.Code § 35.231(a) was inapplicable.[5]

■ Even if the regulation does not apply, Hamilton also argues the EHB abused its discretion in reopening the case and allowing the introduction of the Brookhart report. Hamilton's contention, however, is contrary to the well-settled position of the courts that when exhibits have been inadvertently not admitted, the court or presiding officer may admit them any time up to the conclusion of the hearing. *In re J.E.F.*, 487 Pa. 455, 409 A.2d 1165 (1979). In that case, a Children and Youth Services Agency presented its case before a trial court and rested. The parent moved for compulsory nonsuit and the agency then requested to reopen its case to admit its records into evidence. The trial court denied both motions but after the parent introduced evidence found for the parent. The Supreme Court held that the trial court erred in denying the agency's request to

**3.** Our scope of review of the EHB's decision is to determine whether the record contains substantial evidence to support the EHB's findings of fact, and whether the EHB committed errors of law or constitutional violations. *Mock v. Department of Environmental Resources*, 154 Pa.Commonwealth Ct. 380, 623 A.2d 940 (1993).

**4.** In *Spang & Co. v. Department of Environmental Resources*, 140 Pa.Commonwealth Ct. 306, 314, 592 A.2d 815, 818, *petition for allowance of appeal denied*, 529 Pa. 628, 600 A.2d 543 (1991), we held that because the EHB has no regulation governing a party's request to reopen the record for the purpose of introducing new evidence after the hearing or hearings have ended but before an adjudication, such a request is governed by the General Rules of Administrative Practice and Procedure, specifically 1 Pa.Code § 35.231.

**5.** Hamilton argues that there is no distinction between the conclusion of the hearing, as stated in 1 Pa.Code § 35.231(a), and this case because they moved to sustain their appeal on the basis that DER failed to present a prima facie case. However, Hamilton must admit that when the motion to sustain was denied it was able to present evidence in its defense, therefore there is a distinction between the close of the hearings or proceedings and DER resting its case.

reopen its case to introduce into evidence its records. The Supreme Court stated that it is proper to reopen a case to allow the introduction of additional evidence where the evidence has been omitted by accident, inadvertence, or even because of mistake but not where the omission is intentional; a case may be reopened where it is in the interest of a more accurate adjudication or where an honest purpose would be justly served without unfair disadvantage. *Id.* at 459, 409 A.2d at 1166 (citations omitted). The Court held that the failure to introduce the records appeared to be inadvertent and the records were necessary for an accurate adjudication. Therefore, the Supreme Court held, the record should have been reopened for the introduction of the evidence. *See also Commonwealth v. Beck,* 522 Pa. 194, 560 A.2d 1370 (1989). Moreover, in *Beneshunas v. Independence Life and Accident Insurance Company,* 354 Pa.Superior Ct. 391, 512 A.2d 6 (1986), after the defense rested and before an adjudication was issued by the trial court, the defense was able to obtain the testimony of a witness it had subpoenaed but who had failed to appear. The Superior Court held that witness would have contributed to a more accurate determination of the case and the trial court abused its discretion in not reopening the record after the defense rested. *Id.,* at 399, 512 A.2d at 9.

In this case, we find no clear abuse of discretion by the EHB in reopening the case based on its finding that DER's failure to introduce the exhibits was due to inadvertence and that their introduction would serve an honest purpose and create a more accurate picture for its adjudication.

## II.

Hamilton also contends that the EHB erred in admitting Barnes' expert testimony because the testimony was not based on facts in evidence. It contends that Barnes' testimony is dependent on facts contained in the Hess and Fisher report which was ultimately not admitted into the record.[6]

The principle is well established; an expert, like Barnes, cannot express a conclusion based on facts not in evidence. *Murray v. Siegal,* 413 Pa. 23, 195 A.2d 790 (1963); *Milan v. Commonwealth, Department of Transportation,* 153 Pa.Commonwealth Ct. 276, 620 A.2d 721, *petition for allowance of appeal denied,* 535 Pa. 650, 633 A.2d 154 (1993). However, experts by necessity may rely on the reports of others not admitted into evidence. *Milan* (an expert in accident reconstruction is required to review the police accident report to form his opinion even if the report is not introduced into evidence).

Although we believe Barnes could rely on factual information in a scientific report submitted to DER by Hamilton to form his opinion, we need not address that issue further because Barnes formed his opinion before Hamilton submitted the Hess and Fisher report in October of 1992 and used that report only for confirmation of specific facts. Barnes and Smith, his superior, formed their opinion that a wall existed in the northern part which created a boxcut and their opinion that the boxcut most probably caused the acid mine drainage onto the Cowder property by July of 1992, well before the Hess and Fisher report was submitted. (R.R. 562a). Barnes' testimony establishes that he knew a low wall or high wall existed at the northern edge of the mine site prior to the submission of the Hess and Fisher report and he used the report to confirm his conclusions and to specifically locate the high wall in the northern corner of Little Beth. (R.R. 179a). Barnes' expert opinion would have been the same even if the report had not been submitted to DER.

## III.

Hamilton also argues that Barnes' testimony was not sufficiently certain that a boxcut existed and that it caused the drainage onto Cowder's property because it is based on speculation. While Barnes' opinion need not be based on an absolute certainty, an opinion based on mere possibilities is not competent evidence. *Palmeri v. Common-*

---

6. To the extent that Hamilton makes this argument based on the Brookhart report, it is moot based on our determination in Section I that the

EHB properly allowed DER to reopen its case to introduce the Brookhart report into evidence.

*wealth, Pennsylvania State Police,* 82 Pa.Commonwealth Ct. 348, 474 A.2d 1223 (1984), *affirmed,* 508 Pa. 544, 499 A.2d 278 (1985). To prove causation, an expert witness must testify with "reasonable certainty" that in his or her professional opinion the result in question did come from the cause alleged. *Pirches v. General Accident Insurance Company,* 354 Pa.Superior Ct. 303, 511 A.2d 1349 (1986); *Kravinsky v. Glover,* 263 Pa.Superior Ct. 8, 396 A.2d 1349 (1979). In *Argust v. Dick Mackey General Contracting Co., Inc.,* 390 Pa.Superior Ct. 183, 568 A.2d 255, *petition for allowance of appeal denied,* 527 Pa. 607, 590 A.2d 294 (1990), the Superior Court held that a soils and mining engineer giving expert testimony about the collapse of a wall was sufficiently definite and certain where she stated that an oversteepened slope was the "most probable cause" of the wall collapse. *See also Tabuteau v. London Guarantee & Accident Company,* 351 Pa. 183, 40 A.2d 396 (1945). *Cf. Hussey v. May Department Stores, Inc.,* 238 Pa.Superior Ct. 431, 357 A.2d 635 (1976).

■ As to the existence of the boxcut, Barnes testified that a boxcut was created due to the walls to the northwest and the northern edge of the site. This conclusion was based on the evidence of how Hamilton mined the property, the location of the coal seams and the crop lines of the coal seams, and his knowledge of the result of mining on geological features. Although Barnes expressed that he was uncertain whether it was a high wall or low wall to the northern edge of the mine site, he was not unsure about its existence or that with the high wall to the west it formed a boxcut. The opinion was not based on mere speculation and was sufficiently certain.

As to causation, Barnes testified that, within a reasonable degree of scientific certainty,

the Little Beth Mine Site was the probable cause of the pollutional condition at the Cowder property. (R.R. 262a, 268a, 502a). Moreover, when questioned about the old strip mines to the east of Cowder's property (to the north of Little Beth Mine Site), which was the only other possible cause suggested, Barnes ruled out this possibility. The old mine sites were ruled out as a source of the pollution because the mining was 25 years earlier and should not cause current water problems, and because the water quality was not as bad in the eastern tributary hollow which would be between the 1950's mine site and the Cowder property. (R.R. 478a). After ruling out the only other suggested possible cause of Cowder's pollutional problem, Barnes testimony is, in effect, that Little Beth is the only logical cause of the pollution. Barnes' testimony is "reasonably certain" that Little Beth Mine Site is the cause of the pollution and is admissible as an expert opinion on causation, even though his opinion is stated as "the most probable cause". *Argust.* We find no error in the EHB's decision to admit and rely on the testimony of Barnes.

## IV.

■ Hamilton finally contends that DER's order is beyond its statutory authority and that the EHB applied an inappropriate standard of proof. Although admitting that the courts and the EHB have determined that DER has the authority under The Clean Streams Law (Clean Streams Law), Act of June 22, 1937, P.L. 1987, *as amended,* 35 P.S. §§ 691.1—691.1001, to issue orders requiring testing, Hamilton argues that the order in this case goes beyond DER's statutory authority in Section 316 of the Clean Streams Law, 35 P.S. § 691.316 [7] and beyond

---

7. DER's order stated several sources of authority for its groundwater study order: Sections 5, 316, 402, 601 and 610 of the Clean Streams Law, 35 P.S. §§ 691.5, 691.316, 691.402, 691.601, and 691.610; Sections 4.2 and 4.3 of the Surface Mining Conservation and Reclamation Act (Pa. SMCRA), Act of May 31, 1945, P.L. 1198, *as amended,* 52 P.S. §§ 1396.4b–1396.4c; Section 1917–A of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, *as amended,* 71 P.S. § 510–17, and, the regulations found in Chapters 86 and 87 of 25 Pa.Code. (Original Record,

Attachment A to Exhibit 1; *see also* EHB's decision slip op. at 23). Section 316 was the only section discussed by the EHB as support for DER's order. However, this court may affirm a decision of an administrative agency where the result is correct even though reasons advanced in support of the decision are erroneous so long as the correct basis for the decision is clear on the record. *Markby v. Unemployment Compensation Board of Review,* 129 Pa.Commonwealth Ct. 176, 564 A.2d 1340 (1989).

the cases that have previously allowed testing. It cites *National Wood Preservers v. Department of Environmental Resources*, 489 Pa. 221, 414 A.2d 37, *appeal dismissed*, 449 U.S. 803, 101 S.Ct. 47, 48, 66 L.Ed.2d 7 (1980), and *A.H. Grove and Sons, Inc. v. Department of Environmental Resources*, 70 Pa.Commonwealth Ct. 34, 452 A.2d 586 (1982).

The cases cited by Hamilton determined that orders requiring landowners to perform groundwater studies were authorized by Section 316 of the Clean Streams Law, 35 P.S. § 691.316. Section 316 provides:

> Whenever the department finds that pollution or a danger of pollution is resulting from a condition which exists on land in the Commonwealth the department may order the landowner or occupier to correct the condition in a manner satisfactory to the department or it may order such owner or occupier to allow a mine operator or other person or agency of the Commonwealth access to the land to take such action. . . .

35 P.S. § 691.316.

In *National Wood Preservers*, DER issued an abatement order to landowners and to occupiers who ran a wood preservation business on the land after determining that a nearby stream and groundwater contained pentachlorophenol, a substance used in wood preservation. On appeal, the EHB ordered that the landowners and occupiers first conduct drilling and water sampling to determine the precise amount and dispersion of the pollutant and then to remove it. The Supreme Court held that Section 316 allows DER to eliminate all water pollutants, not just those emanating from mines and was a constitutional exercise of DER's police powers, employing the standards established in *Lawton v. Steele*, 152 U.S. 133, 14 S.Ct. 499, 38 L.Ed. 385 (1894). *National Wood Preservers*, 489 Pa. at 229, 236–39, 414 A.2d at 41, 44–46. Concluding that the EHB's findings that pollution exists under the land were amply supported by the record, the Supreme Court held that the abatement order, including the testing obligations, was reasonably necessary for the abatement of the pollution. *Id.* at 236, 414 A.2d at 44.

In *A.H. Grove*, this court held that an order requiring testing to land and abatement after the precise point of contamination was discovered was authorized under Section 316 of the Clean Streams Law. In that case, DER determined that residential wells were contaminated with gasoline and oil and that these wells were in line downslope from A.H. Grove, an automobile service station. DER issued an order directing A.H. Grove to abate the discharge of gasoline and oil and to perform tests on their storage tanks and test borings on their property. On appeal, the EHB modified the order to eliminate the testing on the storage tanks. This court held that DER demonstrated with sufficient probability that Grove was the source of the pollution to authorize the issuance of the order as modified by the Board. *A.H. Grove*, 70 Pa.Commonwealth Ct. at 41, 452 A.2d at 589. We stated:

> The Board concluded that "[t]he facts clearly support the probability that appellant's activities have in some yet unknown way, contributed to the water problem." The Department concedes that the evidence supporting the finding that Grove's property was logically the most probable source of the contamination is circumstantial in nature. The evidence is nevertheless substantial and competent.

*Id.* at 39, 452 A.2d at 588. We also held that where testing is needed to determine the precise source of contamination on the property and to discover how best to abate the problem, there is no error in requiring the landowner to bear the cost of doing groundwater studies. *Id.* at 42–43, 452 A.2d at 590.

Although we find these decisions instructive as to the type of evidence sufficient to make out a case, they are not on point. In both *National Wood Preservers* and *A.H. Grove*, the groundwater study requirements were issued as part of abatement orders under Section 316. Section 316 is not applicable in this case because DER's order requires only the planning and initiation of studies and does not require abatement of the problem once the source is conclusively

determined.[8] Section 316 expressly authorizes DER, when it determines the property is the source of pollution, to "order the landowner or occupier to correct the condition". Accordingly, Section 316 allows DER to require studies only in the context of an abatement order, just as DER did in *National Wood Preservers* and *A.H. Grove.*

█ Although we do not agree with the EHB that Section 316 authorizes DER's action in this case, Section 610 of the Clean Streams Law gives DER the authority to order groundwater studies absent an abatement order. It provides:

The department may issue such orders as are necessary to aid in the enforcement of the provisions of this act.... Such an order may be issued if the department finds that a condition existing in or on the operation involved is causing or is creating a danger of pollution of the waters of the Commonwealth, or if it finds that the permittee, or any person or municipality is in

violation of any relevant provision of this act, ...

35 P.S. § 691.610.[9]

█ As to the standard of proof applied by the EHB, Section 25 Pa.Code § 21.101(a) establishes a preponderance of the evidence standard in hearings before the EHB.[10] A preponderance of the evidence is such proof as leads the trier of fact to find that the existence of a contested fact is more probable than its nonexistence. *South Hills Health System v. Department of Public Welfare*, 98 Pa.Commonwealth Ct. 183, 186, 510 A.2d 934, 936 (1986). *See also Commonwealth v. $32,-950.00 U.S. Currency*, 160 Pa.Commonwealth Ct. 58, 61 n. 9, 634 A.2d 697, 698 n. 9 (1993) (preponderance of the evidence is tantamount to a "more probable than not" standard). Therefore, to support the groundwater study order, DER had the burden of proving that the Little Beth Mine Site is more probably than not the source of the pollution. The EHB did not, as argued by

8. The September 25, 1992 order of DER provides:

1. On or before October 28, 1992, Al Hamilton shall submit to the Department a written statement describing the history of the mining operations at the Little Beth Operation....
2. On or before October 28, 1992, Al Hamilton shall submit to the Department a plan for defining the geology and hydrogeology of the Little Beth Operation relative to the pollutional conditions at the Cowder properties. The plan shall provide for the installation and sampling of monitoring wells and piezometers in order that the following can be determined:
 a. the effects of Al Hamilton's mining at the Little Beth Operation on groundwater quality in the backfilled mine spoils.
 b. The recharge area for the groundwater sampled at the Cowder properties;
 c. Groundwater flow patterns and directions in the backfilled mine spoil, Clarion and Lower Kittanning coal seams, and over and underlying strata including the flow paths and direction of groundwater flow in the area between the Little Beth Operation and the Cowder properties;

 . . . . .

4. Within 30 days of the Department's approval of the groundwater monitoring plan which is to be submitted pursuant to Paragraph 2 of this Order, Al Hamilton shall complete the installation and commence the measurements and sampling of all the monitoring wells and piezometers which are all called for by the plan....

(Original Record, attachment A to Exhibit 1).

9. Section 4.3 of Pa.SMCRA, 52 P.S. § 1396.4c, has an identical provision to the first sentence of Section 610 of the Clean Streams Law: "The department may issue such orders as are necessary to aid in the enforcement of the provisions of this act". Additionally, DER's regulations address the issue of groundwater in 25 Pa.Code § 87.116:

(a) Groundwater levels, infiltration rates, subsurface flow and storage characteristics and the quality of groundwater shall be monitored in a manner approved by the Department to determine the effects of surface mining activities on the recharge capacity of reclaimed lands and on the quantity and quality of groundwater in the permit and adjacent areas.

. . . .

(c) The person who conducts surface mining activities shall conduct additional hydrologic tests as specific and approved by the Department, including but not limited to drilling, infiltration tests, aquifer tests, chemical and mineralogical analyses of overburden and spoil . . .

10. The burden of proof and standard of proof are set forth in 25 Pa.Code § 21.101(a):

In proceedings before the Board the burden of proceeding and the burden of proof shall be the same as at common law in that the burden shall normally rest with the party asserting the affirmative of an issue. It shall generally be the burden of the party asserting the affirmative of the issue to establish it by a preponderance of the evidence....

Hamilton, apply an incorrect burden of proof.[11] Moreover, in *A.H. Grove*, under Section 316 which requires the same causal connection as under Section 610, that is where DER finds that "a condition existing in or on the operation involved is causing or is creating a danger of pollution", we held the causal connection can be met by DER establishing, even if by circumstantial evidence, that the subject of the order is the "most probable cause" of the pollution. *A.H. Grove.* See also *Farnese v. Southeastern Pennsylvania Transportation Authority*, 338 Pa.Superior Ct. 130, 487 A.2d 887, 889 (1985) (circumstantial evidence may meet a party's burden of proof if it so preponderates in favor of a conclusion as to outweigh in the mind of the fact-finder any other evidence).[12]

 In light of Barnes' expert testimony on causation, which was sufficiently certain and accepted by the EHB, and the other evidence of record, we find substantial evidence to support the EHB's findings that the pollution on the Cowder property was caused by discharge from Little Beth Mine Site and that groundwater monitoring is appropriate. Accordingly, the order of the EHB is affirmed.

### ORDER

AND NOW, this 11th day of May, 1995, the order of the Environmental Hearing Board, dated July 18, 1994, No. 92–471–E is affirmed.

---

11. Hamilton also argues that DER's order is not supported by substantial evidence, citing *A.H. Grove, supra.* The standard set in *A.H. Grove* is not related to DER's order; the substantial evidence test is stated as our review of the EHB's findings and not to the EHB's review of DER's proof to support its order. *A.H. Grove*, 70 Pa.Commonwealth Ct. at 38, 452 A.2d at 588.

12. The EHB uses the term "some nexus" in its conclusions, citing *Harbison–Walker Refractories v. Department of Environmental Resources*, 1989 EHB 1116, to state that DER was required to establish a causal link. Such a statement does not negate DER's burden to prove the causal link by a preponderance of the evidence.